**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

Beluga Chartering GMBH,             :    **ECF Case**

                       Plaintiff,    :    **No.: 08 Civ. 4896**

               v.               :    **DECLARATION OF N. S. CHO**
                                :    **IN SUPPORT OF**
Korea Logistics Systems, Inc.,     :    **DEFENDANT'S MOTION**
                                :    **TO VACATE EX PARTE**
                       Defendant.  :    **ATTACHMENT ORDER**
-------------------------------------------------------X

I, N.S. Cho, state the following, based upon my personal knowledge, information, and belief:

1.      I am the president of defendant Korea Logistics Systems, Inc. ("KLS"), which position I have held since November 1989.

**KLS is a Solvent Corporation.**

2.      I provide the following information to demonstrate to the Court KLS' solvency and to support KLS' motion to vacate the Ex Parte Order of Attachment. KLS has an annual income of approximately $50,000,000 and a profit margin of 9 % in 2007, and has maintained an office in New York since July 2001, through an agent and an affiliated company, K.L.S. America, Inc.

3.      In addition, KLS transacts and conducts business in New York through International Express Shipping Co., Ltd. with the same address of K.L.S. America, Inc., an active New York corporation.

4.    As also stated below, KLS has a legal agent, Smart Cargo Service, with the address of 145-11, 155th Street, Jamaica, NY 11434. This agent is required by Section 19 of the Shipping Act of 1984, 46 App. U.S.C. 1718.

5.    In addition, Mr. D. I. Lee, President of International Express Shipping Co., Ltd. and Smart Cargo Service is the designated agent for service of process for KLS.

6.    KLS is not intending to or contemplating bankruptcy.

7.    In the event that Plaintiff responds to KLS' proposal to litigate this matter before this Court and waive London arbitration, KLS will submit to this Court's jurisdiction, both in personam and subject matter.

8.    I am not aware of any asset or financial search of KSL conducted by Plaintiff.

**Plaintiff Lacks a Prime Facie Claim in Admiralty.**

9.    On or about November 2007, Plaintiff Beluga Chartering GMBH ("Beluga") and KLS entered a Charter Party Agreement in Seoul, Korea, for the charter of the vessel, Belgua Constitution.

10.    The underlying action that forms the basis of Plaintiff's dispute is based upon the Charter Party between Beluga as an operator of a vessel and KLS as a charterer of the vessel. However, it appears that Beluga is an agent of the owner or a disponent owner and may not have privity of contract with KLS to maintain the attachment.

11.    Pursuant to the Charter Party, in November 2007, Beluga transported KLS's shipment from Map Ta Phut, Thailand, Masan, Korea, and Moji, Japan, to Point Lisas, Trinidad Tobago.

12.    During the voyage from Map Ta Phut to Masan, the vessel encountered a tropical typhoon.

13.    I can confirm that the Statement of Sea Protest prepared and issued by the master of the vessel Beluga Constitution, states unequivocally that the vessel encountered a tropical typhoon while crossing South China Sea. The Sea Protest doe not mention in any way any other possible causes of damage to the vessel or cargo. See Attachment No. 1, which is a true and correct copy of the Sea Protest KLS received from the owners of the vessel Beluga as prepared and issued by the Master Mr. Frank Steffen.

14.    Beluga's Verified Complaint, which I have reviewed, also admits that the vessel encountered a typhoon. See Beluga's Complaint ¶ 11.

15.    Beluga knew or should have known that a typhoon was expected in the vessel's route.

16.    However, the vessel sailed through a tropical typhoon, although the typhoon might have been forecasted.

17.    KLS believes that the only reason Beluga sailed through the expected typhoon was because the shorter the voyage, the more lucrative it would be for Beluga.

18.    If there was any damage to the vessel, it was the result of Beluga's own negligence, as admitted by the Sea Protest, attached hereto as Attachment No. 1.

19.    In addition, if there was any damage to the vessel, it was also because of an act of God, for which KLS is not liable or responsible.

20.    For example, the pre and after loading survey at the port of Map Ta Phut states that:

> Cargo Condition Inspection
> Jointly together with the vessel's Chief Officer, we carefully inspected the condition of the aforesaid cargo prior to loading and found that all packages appeared to be in generally sound condition subject to customary for this type of cargo.

The survey report further states that:

Lashing/Securing
. . .
Jointly together with the vessel's Chief Officer and the Stevedore
Foreman, we carefully inspected the stowage and lashing of the four
shipment in cargo hold throughout the loading and we found the
operation have to be carried out in a satisfactory way.
Stowage, [L]ashing and securing was carried out by professional
stevedores under close supervision of all concerned parties, in an
effective and efficient manner.

21.    I can verify that Attachment No. 2 is a true and correct copy of the Pre-
Loading Survey Report I received from Seasia P & I Services, that was prepared while the
subject cargo was being loaded and secured on the M.V. Begula Constitution, at Map Ta Phut
Port, Thailand.

22.    The securing and lashing was performed at the port of loading under a joint
supervision with the vessel's Chief Officer and with assistance of the Beluga Vessel crew in
securing, lashing and welding at the Map Ta Phut, Thailand.

23.    Plaintiff has no prima facie admiralty claim because the Mate's Receipt does not
mention any defective lashing and securing of the cargo.  See Attachment No. 8, which is a
true and correct copy of the Mate's Receipt.  Had there been defective lashing and securing
by KLS, it would hereby been noted in the Mate's Receipt.

24.    If there was any damage to the vessel during the voyage, it resulted from an act
of God or Beluga's reckless sailing of the vessel during and through the tropical typhoon.

**KLS Transacts and Does Business in New York and, Therefore, It Can Be Found
in This District.**

25.    I have personal knowledge that KLS is a registered Non-Vessel-Operating
Common Carrier ("NVOCC") as that term is defined in Section 3 of the Shipping Act of 1984,

46 App. U.S.C. 1702(17)(B).

26.     Under the Shipping Act and the relevant regulations, KLS as a foreign registered NVOCC has published a tariff and filed a bond with the Federal Maritime Commission ("FMC") in the amount of $150,000.00.

27.     The bond is "available to pay for damages against the Principal arising from the Principal's transportation-related activities or order for reparations . . . or any penalty assessed against the Principal . . . ."  See Attachment No. 3, which is a true and correct copy of KLS FMC Bond as it appears filed for public inspection at the Federal Maritime Commission.

28.     Although KLS cannot pass judgment whether Beluga's claim is indeed covered by the bond, the bond itself demonstrates KLS's willingness to comply with the financial responsibility requirements of the Shipping Act of 1984.  I state the foregoing because under the FMC regulations and Shipping Act of 1984, the underwriter of KLS' bond is allowed to review any claim or judgment against KLS' bond to determine if the damages claimed arose from KLS' transportation-related activities.

29.     In addition, pursuant to the relevant FMC regulation with respect to the service of process of a foreign registered Ocean Transportation Intermediary, KLS designated a legal agent in Jamaica, New York and published in its tariff the legal agent's contact information as the following:

> Smart Cargo Service
> 145-11, 155th Street
> Jamaica, NY 11434
> Tel.: 718-525-6350
> Contact : Mr. D.I. Lee – President

KLS's published tariff showing the legal agent's information. Attachment No. 4 is a true and correct copy of KLS' tariff page which is available for public inspection.

30.     Further, KLS's website shows that it has an office in New York providing exactly the same address and contact information for KLS's designated agent for service of process. Attachment No. 5 is a true and correct copy of web-site page showing that it has a location in New York.

31.     The relevant Charter Party between Beluga and KLS provides for arbitration in London, with English Law and London Maritime Arbitrators Association ("LMAA")'s small claims procedure to apply.

32.     Further, the addendum of the Charter Party Section 19(a) states that "This Charter Party shall be governed by and construed in accordance with English Law and any dispute arising out of this Charter Party shall be referred to arbitration in London . . . " Attachment No. 6 is a true and correct copy of Section 19(a), Addendum to Charter Party Agreement.

33.     Pursuant to the arbitration clause, Beluga already designated its arbitrator in London and also appears to want to proceed with the arbitration in London. Attachment No. 7 is a true and correct copy of a fax communication dated June 20, 2008, from William Robertson to Winter Scott, Solicitors, London, regarding Belugas' intent to proceed with London arbitration.

34.     KLS has conveyed to Beluga that KLS is willing to submit to this Court's jurisdiction in the event that Beluga agrees to waive London arbitration. Counsel for KLS has received confirmation from counsel for Beluga that he has conveyed KLS' proposal to Beluga and is waiting for Beluga's response.

35.    KLS alleges that, this Court is no more convenient for Beluga than London for a dispute between Beluga, a German corporation and KLS, a South Korea corporation.

36.    Further, KLS is entitled to know whether Beluga intends to resolve its dispute with KLS in this Court or in London.

37.    The funds attached by Beluga are KLS's payments to its foreign inland carriers, which were never related with the dispute between Beluga and KLS.

38.    Regardless of Beluga's intent, KLS maintains that Beluga should not be allowed to continue the attachment of KLS's funds in this district.

39.    KLS has received a demand for damages to its customer, Samsung Engineering Co., Ltd., related to the subject Charter Party voyage subject of this action and London arbitration. Samsung alleges that KLS delivered Samsung's cargo damaged and delayed the arrival of the cargo on the Beluga Constitution. Samsung alleges that KLS delivered Samsung's cargo damaged and delivered the cargo late, which caused Samsung damages in the amount of $3,185,000.00. As a result, KLS will seek indemnification and contribution from plaintiff in the amount of $3,185,000.00. See Attachment 9, Claim for Damages from Samsung Engineering, Co., Ltd., Translation Certification and Notary Certificate.

40.    In the event that this Court denies KLS' Motion to Vacate the Ex Parte Order of Attachment, KLS respectfully requests that the court require security on KLS' counterclaim in the amount of $3,185,000.00 pursuant to Rule E (9) of the Supplemental Rules for Certain Admiralty and Maritime Claims.

The undersigned declares that under penalty of perjury under the laws of the United States of America the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Respectfully submitted,

By: _____

N.S. Cho, President
Korea Logistics Systems, Inc.

Dated: August __5__, 2008

8

# Attachment No. 1

To the Notary Office of Hongkong                    Port of Hongkong
date: 25. Nov 2007

## STATEMENT OF SEA PROTEST

I, Frank Steffens (prename, surname), Master of the m/v "BELUGA CONSTITUTION" under Antigua, official No. 1797, call sign V2C19 and 10899 gross register tons, on the 18th of November 2007, at 2342 hrs sailed from the port of Maptaphut/Thailand with a cargo of 1116,9 mt general cargo, destined for Trinidad and arrived at port of Hongkong on 25.November 2007 at 1300lt

During the voyage while crossing South China Sea the vessel encountered very heavy weather with winds of whole storm force and very high sea upto state 10/12m with wind force Beaufort 11; the vessel during that period was rolling, pitching and labouring heavily, shipping sea water Fore and Aft, hatches and vents being continually awashed.

On the 22th November around 1600 hrs the vessel was hit by a very large cross wave from starboardside, shipping seas all over and causing vessel to roll heavily on both sides upto 35 degrees in a very short period of time..

During the aforementioned heavy weather the vessel was obliged to reduce the engine speed and to change her courses to avoid damage to the ship and the cargo.

I, the Master, fearing that notwithstanding all measures of good seamanship taken by me and my crew some loss or damage might be caused to the said ship or her appurtenance or cargo or some other property on board by reason of heavy weather.

I hereby note my protest against any claims by all persons or person whom it shall or may concern, and declare that all and every damage and loss sustained by the said ship and/or cargo, or some other property on board in consequence of the accident aforesaid, are and shall be borne by those who, according to the laws and customs of the sea, shall bear the consequences thereof, the same having occurred as above stated not by or through the want of care of myself or my crew.

I reserve the right to extend this protest at time and place convenient.

I , Frank Steffens, Master, do solemnly and sincerely declare that the foregoing statement is correct and contains a true account of the facts and circumstances.

Official Deck Log Book extracts attached.

Frank Steffens / master          ------------------------------(signature)

Ruslan Sklyar / chiefmate        ------------------------------(signature)

# Attachment No. 2


SEASIA P&I

Thailand
P&I Correspondents & Claims
Consultants

14th Floor Fortune Condotown 315/590
Soi Sathupradit 19 · Yannawa
Bangkok 10120 · Thailand
Tel (662) 674 0636 · fax (66 2) 674 1730
e-mail: thailand@seasia.com.sg

Our Ref No.    : MAR 2007-91167                    Date : 22nd November 2007

<u>PRIVATE AND CONFIDENTIAL REPORT</u>

<u>ORIGINAL</u>


SEASIA P&I

**Thailand**
P&I Correspondents & Claims
Consultants

14ᵗʰ Floor Fortune Condotown 315/590
Soi Sathupradit 19 · Yannawa
Bangkok 10120 · Thailand
Tel (662) 674 0636 · fax (66 2) 674 1730
e-mail: thailand@seasia.com.sg

**SEACCESS AGENCY SERVICES CO., LTD.**
8 Sricha-Nakorn 5 Road.,
Sriracha, Cholburi Province 20110

For Attention of Mr. Daniel (S. Anupong)

**Yr Ref.**    : TBA
**Our Ref.**   : SEA/MAR 2007-91167                          22nd November 2007.

# Private and Confidential
# Report

| | |
|---|---|
| Client | : Seaccess Agency Services Co., Ltd., for and on behaldf of Korea Logistics Systems Inc. |
| Name of Vessel | : M.V. "BELUGA CONSTITUTION" |
| Interest Crago | : Equipment and Materials for The Hater F-06-1901 for Petrotrin Project / Trinidad |
| Voyage | : Map Taphud Port, Thailand to Point Lisas Port, Trinidad & Tobago |
| Nature of Survey | : To carry out a Pre-Loading Survey whislt the subject cargo was being loaded and secured on the M.V. "BELUGA CONSTITUTION" at Map Taphud Port, Thailand bound for Point Lisas Port, Trinidad & Tabago |
| Dtae and Place of | : from 13ᵗʰ to 18ᵗʰ November 2007 at Map Taphud Port |

SINGAPORE · BANGLADESH · HONG KONG · INDIA · JAPAN · MALAYSIA
MYANMAR · PAKISTAN · PHILIPPINES · TAIWAN · THAILAND · VIETNAM

SEASIA P&I SERVICES ─────────────────────────

## GENERAL

We were appointed by Seaccess Agency Srevices Co., Ltd.,  in order to  oversee the loading and securing of  the cargo of Equipment and Materials for The Hater F-06-1901 for Petrotrin Project / Trinidad at the port of Map Taphud Port, Thailand.

M/V "BELUGA CONSTITUTION" arrived at Map Taphud Pilot Station at 1730 hours LT on 11th November 2007, pilot boarded the vessel at 1230 LT on 13th November 2007 and she was berthed at Map Taphud Port Thai Prosperity Terminal (TPT) at 1330 hours LT the same day for loading.  The interested cargo to be loaded, under Shipping Orders Nos. 020/11/07 had been transported from the premises of the manufacturers by trailer trucks to the open storage yard of Thai Prosperity Terminal (TPT) before arrival the vessel and which were delivered to ship side by trailer truck directly from the premises of the manufacturers.

Loading commenced at 0900 LT on the 14th November and completed at 1800 LT on 18th November 2007, securing continued until 2030 LT  on 18th November 2007 and the vessel left Map Taphud Port, Thaialnd at 2400 LT on 18th November 2007 for Point Lisas Port, Trinidad & Tobago.

## CARGO DETAILS (As Declared)

| Shipping Order Nos. | 020/11/07 |
|---|---|
| Cargo Description | Equipment and Materials for The Heater F-06-1901 for Pretrotrin Project / Trinidad |
| Shipper | Vatana Phaisal Engineering Co., Ltd. |
| Consignee (Notify) | Petrotrin. |
| Port of Loading | Map Taphud, Thailand |
| Port of Discharge | Point Lisas Port, Trinidad & Tobago |
| Quantity | 78 Packages |
| Weight | 1,034.993 M/Tons N.W.<br>1,116.919 M/Tons G.W. |
| Measurement | 8,708.75 CBM. |

SEASIA P&I SERVICES ─────────────────────────────

Thailand
P&I Correspondents & Claims Consultants

## PACKING DETAILS

The goods of Equipment and Materails for The Haeter F-06-9101 for Petrotrin Project / Trinidad are comprised of 63 steel shipping frames, 2 steel cases, 2 bundles and 10 steel skids.

## CARGO CONDITION INSPECTION

Jointly together with the vessel's Chief Officer, we carefully inspected the condition of the aforesaid cargo prior to loading and found that all packages appeared to be in generally sound condition subject to customary for this type of cargo.

However some minor defects of a number of packages were found and noted by us as below :-

+ Paint works of Materials & Equipments partly / slightly affected by scratch marks.

+ Materials & Equipment partly / slightly affected by rust.

+ Materials & Equipment partly / slightly affected by mud stains.

+ Nineteen packages (Package No. SS-PTR-VPE-003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 025, 026, 027, 028, 029,030, 045, 046 and 047) water standing / remaining on top of Equipment & Materails.

+ Fourteen packages (Package No. SS-PTR-VPE-001, 002, 013, 014, 015, 016, 017, 018, 019, 020, 021, 022, 023 and 024), were found with standing water remaining on top parts.

+ One package (Package No. 14213), Equipment & Materails partly affected by rust.

+ One package (SS-PTR-VPE-030), lower steel structure (Steel Plate) of Radiant Arch Panel slightly bent at edge.

- 3 -



SEASIA P&I SERVICES ———————————————————

+ Two packages (SS-PTR-VPE-022 and 023), lower steel shipping frames (Steel Channel) slightly bent.

+ Seven packages (Package No. SS-PTR-VPE-004, 005, 006, 007, 008, 010 and 011), plastic sheet wraps partly / slightly torn.

+ Seven packages (Package No. SS-PTR-VPE-003 and 009), plastic wraps partly / slightly torn and insulations apparently affected by wetness and damp.

+ One package (SS-PTR-VPE-066), lower structure ( angle bar ) of steel platform slightly bent.

+ One package (SS-PTR-VPE-045), lower structure (Chennel bar) of upper Convection Module slightly bent.

+ One package (SS-PTR-VPE-050), structure of Stack Section # 1 slightly dented at one end.


### CHLORIDE TEST

Using a solution of Silver Nitrate, we checked the cargo contents where affected by rust at random. The results proved negatively indicating that the rust present originated from **fresh water**.

- 4 -



SEASIA P&I SERVICES ──────────────────────────

Thailand
P&I Correspondents & Claims Consultants

### VESSEL'S PARTICULARS

**Name of Vessel**           : M.V. "BELUGA CONSTITUTION"

**Port of Registry**         : St. John's

**Name of Owner**            : Beluga Shipping GmbH.

**Official No./Call Sign**   : 1797 / V 2 C I 9

**Class / Type of Vessel**   : GL / General Cargo

**Year Built**               : 2006

**GRT / NRT**                : 10,899.00 / 5,766.00 Tonnes

**Summer Deadweight**        : 12,600.00 M/Tons

**LOA / LBP**                : 156.76 / 146.05 Metres

**Cargo compartments**       : 2 Hatches / Holds / Tween Decks

**Type of Hatch Cover**      : Folding Steel Panels

**Name of Master**           : Capt. Frank Steffens

The M.V. "BELUGA CONSTITUTION" is a general cargo ship, there is two holds/ hatches. Cargo holds forward of her accommodation, navigation and machine spaces.

The hatch covers are steel folding type. We noted the hatch rubber packing, compression bars, drain channels and securing devices to be in a satisfactory condition.

- 5 -



SEASIA P&I SERVICES ─────────────────────────

### VESSEL'S CERTIFICATES

**International Load Line**   Issued   : 09/05/07 at Humburg
Expires  : 31/09/11

**Safety Construction**   Issued   : 15/03/07 at Humburg
Expires  : 03/09/11

**Safety Radiotelegraphy**   Issued   : 15/03/07 at Humburg
Expires  : 03/09/11

**Safety Equipment**   Issued   : 15/03/07 at Humburg
Expires  : 03/09/11

**Derat Exception**   Issued   : 28/10/07 at Rotterdam
Expires  : 27/03/08

### LOADING

Prior to commencement of loading, we met with the Master, Chief Officer, Stevedore Foreman and the Chaterer's Supercargo (Mr. Y.K. Kim) in order to discuss the loading, stowage and securing arrangement of the aforementioned cargo.

Loading commenced at 0900 hours on 14th Novemeber 2007, faciliated by means of the vessel's cranes using wire slings with shackle attached, from trailer trucks direct to the vessel. Loading continued without any untoward incidfent until completion at 1800 hours on 18th November 2007.

SEASIA P&I SERVICES

Thailand
P&I Correspondents & Claims Consultants

## CARGO STOWAGE

Stowage of the interested ccargo loaded on baord the vessel, were recorded as belows :-

| Hold's Location | Loading Commenced | Loading Completed | Numbers of Packages /Weight |
|---|---|---|---|
| H # 1 | 14/11/07 @ 1200 | 18/11/07 @ 1800 | 49  Pacakges (802.251 M/Tons) |
| H # 2 | 14/11/07 @ 0900 | 18/11/07 @ 1800 | 29  Pacakges (314.668 M/Tons) |

**Total : 78  Packages
(1,116.919 M/Tons)**

## LASHING / SECURING

Securing of the cargo was carried out in conjunction with the loading. all securing materials were checked by us and found to be in satisfactory condition and suitable to use on board the vessel.  Lumber was cut to size as and when required.

In order to prevent the shipping frames coming into contact with the ship structure, lashing and chocking gangs were employed by the Charterers to arrange the chocking and dunnaging. Flat thick dunnage wood was laid on tank tops and on hatch top prior to stowing the cargo. Furthermore square dunnage wood and wedges were placed at the ship sides and hatch coaming and other areas as required.

Pad eyes were welded to the cargo hold tank tops / tween decks as ship sides as necessary, in order to lash the cargo.  Welding works in the cargo holds were carried out by the stevedores.

SEASIA P&I SERVICES

Thailand
P&I Correspondents & Claims Consultants

Further dunnaging and lashing took place as loading proceeded, as and where required.

Chocking was used in areas of broken stowage between ship sides and cargo and/or between units/pieces of cargo as necessary.

Chain, wire and belt lashings were secured to ringbolts at the ship sides and/or bulkheads – of which there were an adequate number. Lashings were also fixed between the cargo. All lashings were found to be tightened properly.

Furthermore a number of 3 packages (Packages Nos. SSPTR-VPE-045, 046 and 047) of heay lift cargo were loaded and stowed 1n No. 2 lower hold using welded stoppers around the basement of the cargo in order to prevent the packages moving / shifting during sea passage.

Jointly together with the vessel's Chief Officer and the Stevedore Foreman, we carefully inspected the stowage and lashing of the four shipment in cargo hold throughout the loading and we found the operation have to be carried out in a satisfactory way.

*Stowage, Lashing and securing was carried out by professional stevedores under close supervision of all concerned parties, in an effective and efficient manner.*



SEASIA P&I SERVICES

Thailand
P&I Correspondents & Claims Consultants

**Attachments:**

1  -  *Photos taken during the survey*

2  -  *Packing List*

3  -  *Ship's Particulars*

4  -  *Copies of Mate's Receipt*

5  -  *Statement of Fact*

6  -  *Stowage Plan*

7  -  *Exception Cargo List*



SEASIA P&I SERVICES ————————————————

## DAMAGE TO CARGO DURING LOADING

We thoroughly monitored the condition of cargo throughout the loading operation and found some minoe defect to cargo occurred during loading/ stowing operation.

The following minor damage to one package was found to have occurred during the course of loading.

+ One package (Package No. SS-PTR-VPE-053), steel fin at out side of Stack Section # 4 slightly bent.

Apart from the aforesaid damage, no major damage to the cargo was found during loading.

*This report is issued to the best of our ability and without prejudice to liability.*

Yours faithfully,

SEASIA P&I SERVICES

**SEASIA P & I SERVICES THAILAND LIMITED.**

- 9 -

# Attachment No. 3

*010632*

## Form FMC-48
## FEDERAL MARITIME COMMISSION

### Ocean Transportation Intermediary (OTI) Bond
### (Section 19, Shipping Act of 1984, as amended by the Ocean Shipping Reform Act of 1998 and the Coast Guard Authorization Act of 1998)

KOREA LOGISTICS SYSTEMS, INC. _____ [indicate whether

NVOCC ~~or~~ ~~Freight~~ ~~Forwarder~~], as Principal (hereinafter "Principal"), and

HARTFORD FIRE INSURANCE COMPANY _____, as Surety (hereinafter "Surety") are held and firmly bound unto the United States of America in the sum of $ 150,000.00 for the payment of which sum we bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally.

Whereas, Principal operates as an OTI in the waterborne foreign commerce of the United States in accordance with the Shipping Act of 1984, as amended by the Ocean Shipping Reform Act of 1998 and the Coast Guard Authorization Act of 1998 ("1984 Act"), 46 U.S.C. app 1702, and, if necessary, has a valid tariff published pursuant to 46 CFR part 515 and 520, and pursuant to section 19 of the 1984 Act, files this bond with the Commission;

Now, Therefore, The condition of this obligation is that the penalty amount of this bond shall be available to pay any judgment or any settlement made pursuant to a claim under 46 CFR § 515.23 (b) for damages against the Principal arising from the Principal's transportation-related activities or order for reparations issued pursuant to section 11 of the 1984 Act, 46 U.S.C. app. 1710, or any penalty assessed against the Principal pursuant to section 13 of the 1984 Act, 46 U.S.C. app. 1712.

This bond shall inure to the benefit of any and all persons who have obtained a judgment or a settlement made pursuant to a claim under 46 CFR 515.23 (b) for damages against the Principal arising from its transportation-related activities or order of reparation issued pursuant to section 11 of the 1984 Act, and to the benefit of the Federal Maritime Commission for any penalty assessed against the Principal Pursuant to Section 13 of the 1984 Act. However, the bond shall not apply to shipments of used household goods and personal effects for the account of the Department of Defense or the account of federal civilian executive agencies shipping under the International Household Goods Program administered by the General Services Administration.

Form FMC-48
(Rev. 05/99)

1

JGINVOCC66C

The liability of the Surety shall not be discharge by any payment or succession of payments hereunder, unless and until such payment or payments shall aggregate the penalty of this bond, and in no event shall the Surety's total obligation hereunder exceed said penalty regardless of the number of claims or claimants.

This bond is effective the __16TH__ day of __AUGUST__, __2001__, and shall continue in effect until discharged or terminated as herein provided. The Principal or the Surety may at any time terminate this bond by written notice to the Federal Maritime Commission at its office in Washington, DC. Such termination shall become effective thirty (30) days after receipt of said notice by the Commission. The Surety shall not be liable for any transportation-related activities of the Principal after the expiration of the 30-day period but such termination shall not affect the liability of the Principal and Surety for any event occurring prior to the date when said termination becomes effective.

The Surety consents to be sued directly in respect of any **bona fide** claim owed by Principal for damages, reparations or penalties arising from the transportation-related activities under the 1984 Act of Principal in the event that such legal liability has not been discharged by the Principal or Surety after a claimant has obtained a final judgment (after appeal, if any) against the Principal from a United States Federal or State Court of competent jurisdiction and has complied with the procedures for collecting on such a judgment pursuant to 46 CFR 515.23 (b), the Federal Maritime Commission, or where all parties an claimants otherwise mutually consent, from a foreign court, or where such claimant has become entitled to payment of a specified sum by virtue of a compromise settlement agreement made with the Principal and/or Surety pursuant to 46 CFR 515.23 (b), whereby, upon payment of the agreed sum, the Surety is to be fully, irrevocably and unconditionally discharged from all further liability to such claimant; provided, however, that Surety's total obligation hereunder shall not exceed the amount set forth in 46 CFR 515.21, as applicable.

The underwriting Surety will promptly notify the Director, Bureau of Tariffs, Certification and Licensing, Federal Maritime Commission, Washington, DC 20573, of any claim(s) against this bond.

Form FMC-48
(Rev. 05/99)

2

JGINVOCC083

Signed and sealed this ___27th___ day of ___July___, ___2001___.

(Please type name of signer under each signature)

_____    Individual Principal or Partner

_____    Business Address

_____    Individual Principal or Partner

_____    Business Address

_____    Individual Principal or Partner

_____    Business Address

_____

Trade Name, If Any

KOREA LOGISTICS SYSTEMS, INC.        Corporate Principal

KOREA                                State of Incorporation

N/A

Trade Name, If Any
13TH FL., PUSAN TRADE CENTER B/D, 87-7 4-KA, CHUNGANG-DONG,
CHUNG-KU, PUSAN, KOREA               Business Address

                                     By

NAM SUN CHO  -  PRESIDENT            Title

(Affix Corporate Seal)

Hartford Fire Insurance Co.          Corporate Surety

One Exeter Plaza, Third Floor
Boston, MA  02116                    Business Address

                                     By

James M. Gorman

Attorney-in-Fact                     Title

(Affix Corporate Seal)

Form FMC-48
(Rev. 05/99)

3
JGINV000086

**Attachment No. 4**

| KOREA LOGISTICS SYSTEMS INC.   010632 | | ORIG/REV | PAGE NO. |
|---|---|---|---|
| | | 4 | 57.000.000 |
| | | CANCELS | PAGE NO. |
| FOREIGN COMMODITY TARIFF NO. 3          FMC NO. 3 | | 3 | 57.000.000 |
| BETWEEN : PORTS AND POINTS    AND: PORTS AND POINTS | | ISSUING DATE | |
| IN ASIA                    IN THE UNITED STATES | | January 26, 2004 | |
| (AS SHOWN IN RULE 1) | | CORR NO. | |

| RULES AND REGULATIONS | RULE NO. |
|---|---|

RULE=24    NVOCCs in foreign commerce
TABLE:
EFFECTIVE DATE: 01/26/05   EXPIRATION DATE:          AMENDMENT: C
                                                      SPECIAL CASE:

A. Carrier has posted a Surety Bond in the amount required
   by 46 CFR part 515 to insure the financial
   responsibility of the carrier for the payment of any
   judgement for damages arising from Carrier's
   transportation-related activities and any order for
   reparations issued pursuant to section 13 of the Shipping
   Act or penalties assessed under section of the Shipping
   Act.

   Bond No. : JGINVOCC086

   Surety Company and Address :

   Hartford Fire Insurance Company
   One Exeter Plaza, Third Floor
   Boston, MA 02116

B. Carrier has designated the following as legal/resident
   agent in the United States as required by 46 CFR Part
   515 for the receipt of judicial and administrative
   process, including subpoenas:

   1. Name/Address of Resident/Legal Agent:

      SMART CARGO SERVICE
      145-11, 155th Street,
      Jamaica, NY 11434
      Tel: 718-525-6350
      Contact: Mr. D.I. Lee - President

   2. If the designated legal agent cannot be served
      because of death, disability or unavailability, the
      Secretary, Federal Maritime Commission, will be
      deemed to be the legal agent for service of
      process.

   3. Service of administrative process, other than
      subpoenas, may be effected upon the legal agent by
      mailing a copy of the documents to be served by
      certified or registered mail, return receipt
      requested.

**Attachment No. 5**



ADD : 145-11, 155TH STREET, JAMAICA, NY 11434, USA
TEL : +1-718-525-6350
FAX : +1-718-525-6352



ADD : Rm.620, Essence Commercial Hotel, #10, Fuzhou Rd., Qingdao, China
TEL : +86-532-8601-8095~8
FAX : +86-532-8601-8094



ADD : Rm.1506, fiance Square, #333 Jiu Jiang Rd., Shanghai, P.R.China
TEL : +86-21-63508320
FAX : +86-21-63503510

menu_idx: 61 , level :

# Attachment No. 6

03-07-08:22:34   :K.L.S                                          :025671451            #  1/  6

| 1. Shipbroker<br><br>Heavylift Korea Co Ltd<br># 905 Bolim Bldg. 5-1<br>Myoung-Dong 1-GA<br>Chung-Ku / Seoul | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976<br>and 1994)<br>(To be used for trades for which no approved form is in force)<br>CODE NAME "GENCON"    Part I |
|---|---|
| | 2. Place and date<br>Bremen 30.Oct 2007 |
| 3. Owners/Place of business (Cl. 1)<br>Beluga Chartering GmbH as agents to the owners<br>Schlachte 22<br>28195 Bremen<br>Germany | 4. Charterers/Place of business (Cl. 1)<br>Korea Logistics Systems Inc.<br>Room 1807, 18th Floor, Jangyo Bldg 1<br>Jangyo - Dong, Jung - Ku<br>Seoul |
| 5. Vessel's name (Cl. 1)<br>Beluga Constitution | 6. GRT/NRT (Cl. 1)<br>10,899 / 5.766 |
| 7. DWT all told on summer load line to metric tons (abt.) (Cl. 1)<br>12477 tdw | 8. Present position (Cl. 1)<br><br>trading |
| 9. Expected ready to load (abt.) (Cl. 1)<br>10-30.Nov 2007 | |
| 10. Loading port or place (Cl. 1)<br>each 1spb aaaa Laem Chabang or Map Ta Phut in charteror's<br>option, to be declared latest 3 days prior ETA, and Masan and<br>Moji | 11. Discharging port or place (Cl. 1)<br>1 spb aaaa Point Lisas, Trinidad & Tobago |
| 12. Cargo (also state quantity and margin on Charters' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1)<br>Full and complete cargo under / on deck in charterers' option. Cargo intake, loading, stowage and discharging always as per<br>vsls stability, trim, permissible stackweight, regulations connected to the trade and masters entire satisfactio. All cargo to<br>be non dangerous, harmless, lawful and presenting no danger to vessel and crew | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br><br>US$ 2.250.000 lumpsum FIOS l/ald bss 3 load / 1 dischport | 14. Freight payment (state currency and method of payment; also Beneficiary<br>and bank account) (Cl. 4)<br>Freight payable into owners' nominated bank account<br>within 3 b/d after completion of loading |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b).<br>If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | a) Laytime for loading |
| 18. Agents (loading) (Cl. 6) | b) Laytime for discharging |
| 19. Agents (discharging) (Cl. 6) | c) Total laytime for loading and discharging<br>15 total days ashinc |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>US$ 18.500 pdpr free despatch all ports<br>Demurrage at loadport, if any payable together with the freight<br>Demurrage at dischport, if any payable wit 5 days after compl discharging | 21. Cancelling date (Cl. 9)<br>30. Nov 07 |
| | 22. General Average to be adjusted at (Cl. 12) |
| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c) ) ) | 24. Brokerage commission and to whom payable (Cl. 15) |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed<br>also state Place of Arbitration (if not filled in 19 (a) shall apply) (Cl. 19)<br>arbitration in London, English Law/ LMAA, small claims<br>procedure to apply | total 5 % commission on the freight<br>payable to Heavylift Korea |
| (a) State maximum amount for small claims-charterers' arbitration (Cl. 19)<br>US$ 50.000 | 26. Additional clauses covering special provisions, if agreed |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II.
In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

87-7, 4Ka, Chungang-Dong, Chung-Ku Busan, Korea

**Korea Logistics Systems Inc.**

President  Nam Sun Cho

H  (1/6)

03-07-08:22:34 :K.L.S                    :025671451          # 3/ 6

    

## PART II
## „Gencon" Charter (As Revised 1922, 1976 and 1994)

14  Agency                                                    207
    In every case the Owners shall appoint their own Agent both at the port of    208
    loading and the port of discharging                       209

15  Brokerage                                                 210
    A brokerage commission at the rate stated in Box 24 on the freight, dead-freight    211
    and demurrage earned is due to the party mentioned in Box 24    212
    In case of non-execution 1/3 of the brokerage on the estimated amount of    213
    freight to be paid by the party responsible for such non-execution to the    214
    Brokers as indemnity for the latter's expenses and work. In case of more    215
    voyages the amount of indemnity to be agreed.             216

16  General Strike Clause                                     217
    (a) If there is a strike or lock-out affecting or preventing the actual loading of the    218
    cargo, or any part of it, when the Vessel is ready to proceed from her last port or    219
    at any time during the voyage to the port of loading or after her arrival    220
    there, the Master or the Owners may ask the Charterers to declare, that they    221
    agree to reckon the laydays as if there were no strike or lock-out. Unless the    222
    Charterers have given such declaration in writing (by telegram, if necessary)    223
    within 24 hours, the Owners shall have the option of cancelling this Charter    224
    Party. If part cargo has already been loaded, the Owners must proceed with    225
    same, (freight payable on loaded quantity only) having liberty to complete with    226
    other cargo on the way for their own account.             227
    (b) If there is a strike or lock-out affecting or preventing the actual discharging    228
    of the cargo on or after the Vessel's arrival at or off port of discharge and same    229
    has not been settled within 48 hours, the Charterers shall have the option of    230
    keeping the Vessel waiting until such strike or lock-out is at an end against    231
    paying half demurrage after expiration of the time provided for discharging    232
    until the strike or lock-out terminates and thereafter full demurrage shall be    233
    payable until the completion of discharging, or of ordering the Vessel to a safe    234
    port where she can safely discharge without risk of being detained by strike or    235
    lock-out. Such orders to be given within 48 hours after the Master or the    236
    Owners have given notice to the Charterers of the strike or lock-out affecting    237
    the discharge. On delivery of the cargo at such port, all conditions of this    238
    Charter Party and of the Bill of Lading shall apply and the Vessel shall receive    239
    the same freight as if she had discharged at the original port of destination,    240
    except that if the distance to the substituted port exceeds 100 nautical miles,    241
    the freight on the cargo delivered at the substituted port to be increased in    242
    proportion.                                               243
    (c) Except for the obligations described above, neither the Charterers nor the    244
    Owners shall be responsible for the consequences of any strikes or lock-outs    245
    preventing or affecting the actual loading or discharging of the cargo.    246

17  War Risks ("Voywar 1993")                                247
    (1) For the purpose of this clause, the words:
        (a) The "Owners" shall include the shipowners, bareboat charterers,    248
        disponent owners, managers or other operators who are charged with    249
        management of the Vessel, and the Master; and    250
        (b) "War Risks" shall include any war (whether actual or threatened), act of    251
        war, civil war, hostilities, revolution, rebellion, civil commotion, warlike    252
        operations, the laying of mines (whether actual or reported), acts of piracy,    253
        acts of terrorists, acts of hostility or malicious damage, blockades    254
        (whether imposed against all Vessels or imposed selectively against    255
        Vessels of certain flags or ownership, or against certain cargoes or    256
        crews or otherwise howsoever), by any person, body, terrorist or political    257
        group, or the Government of any state whatsoever, which, in the reasonable    258
        judgement of the Master and/or the Owners, may be dangerous or are    259
        likely to be or to become dangerous to the Vessel, her cargo, crew or other    260
        persons on board the Vessel.                          261
    (2) If at any time before the Vessel commences loading, it appears that, in the    262
    reasonable judgement of the Master and/or the Owners, performance of    263
    the Contract of Carriage, or any part of it, may expose, or is likely to expose,    264
    the Vessel, her cargo, crew or other persons on board the Vessel to War    265
    Risks, the Owners may give notice to the Charterers cancelling this    266
    Contract of Carriage, or may refuse to perform such part of it as may    267
    expose, or may be likely to expose, the Vessel, her cargo, crew or other    268
    persons on board the Vessel to War Risks; provided always that if this    269
    Contract of Carriage provides that loading or discharging is to take place    270
    within a range of ports, and at such port or ports nominated by the Charterers    271
    the Vessel, her cargo, crew or other persons onboard the Vessel may be    272
    exposed, or may be likely to be exposed, to War Risks, the Owners shall    273
    first require the Charterers to nominate any other safe port which lies    274
    within the range for loading or discharging, and may only cancel this    275
    Contract of Carriage if the Charterers shall not have nominated such safe    276
    port or ports within 48 hours of receipt of notice of such requirement.    277
    (3) The Owners shall not be required to continue to load cargo for any voyage,    278
    or to sign Bills of Lading for any port or place, or to proceed or continue on    279
    any voyage, or on any part thereof, or to proceed through any canal or    280
    waterway, or to proceed to or remain at any port or place whatsoever,    281
    where it appears, either after the loading of the cargo commences, or at    282
    any stage of the voyage thereafter before the discharge of the cargo is    283
    completed, that, in the reasonable judgement of the Master and/or the    284
    Owners, the Vessel, her cargo (or any part thereof), crew or other persons    285
    on board the Vessel (or any one or more of them) may be, or are likely to be,    286
    exposed to War Risks. If it should so appear, the Owners may by notice    287
    request the Charterers to nominate a safe port for the discharge of the    288
    cargo or any part thereof, and if within 48 hours of the receipt of such    289
    notice, the Charterers shall not have nominated such a port, the Owners    290
    may discharge the cargo at any safe port of their choosing (including the port    291
    of loading) in complete fulfilment of the Contract of Carriage. The Owners    292
    shall be entitled to recover from the Charterers the extra expenses of such    293
    discharge and, if the discharge takes place at any port other than the    294
    loading port, to receive the full freight as though the cargo had been    295
    carried to the discharging port and if the extra distance exceeds 100 miles,    296
    to additional freight which shall be the same percentage of the freight    297
    contracted for as the percentage which the extra distance represents to the    298
    distance of the normal and customary route, the Owners having a lien on    299
    the cargo for such expenses and freight.                  300
    (4) If at any stage of the voyage after the loading of the cargo commences, it    301
    appears that, in the reasonable judgement of the Master and/or the    302
    Owners, the Vessel, her cargo, crew or other persons on board the Vessel    303
    may be, or are likely to be, exposed to War Risks on any part of the route    304
    (including any canal or waterway) which is normally and customarily used    305
    in a voyage of the nature contracted for, and there is another longer route    306
    to the discharging port, the Owners shall give notice to the Charterers that    307
    this route will be taken. In this event the Owners shall be entitled, if the total    308
    extra distance exceeds 100 miles, to additional freight which shall be the    309
    same percentage of the freight contracted for as the percentage which the    310
    extra distance represents to the distance of the normal and customary    311
    route.                                                    312
    313

(c)  The Vessel shall have liberty:-                          314
    (a) to comply with all orders, directions, recommendations or advice as to    315
    departure, arrival, routes, sailing in convoy, ports of call, stoppages,    316
    destinations, discharge of cargo, delivery or in any way whatsoever which    317
    are given by the Government of the Nation under whose flag the Vessel    318
    sails, or other Government to whose laws the Owners are subject, or any    319
    other Government which so requires, or any body or group acting with the    320
    power to compel compliance with their orders or directions;    321
    (b) to comply with the orders, directions or recommendations of any war    322
    risks underwriters who have the authority to give the same under the terms    323
    of the war risks insurance;                               324
    (c) to comply with the terms of any resolution of the Security Council of the    325
    United Nations, any directives of the European Community, the effective    326
    orders of any other Supranational body which has the right to issue and    327
    give the same, and with national laws aimed at enforcing the same to which    328
    the Owners are subject, and to obey the orders and directions of those who    329
    are charged with their enforcement;                       330
    (d) to discharge at any other port any cargo or part thereof which may    331
    render the Vessel liable to confiscation as a contraband carrier;    332
    (e) to call at any other port to change the crew or any part thereof or other    333
    persons on board the Vessel when there is reason to believe that they may    334
    be subject to internment, imprisonment or other sanctions;    335
    (f) where cargo has not been loaded or has been discharged by the    336
    Owners, under any provisions of this Clause, to load other cargo for the    337
    Owners' own benefit and carry it to any other port or ports whatsoever,    338
    whether backwards or forwards or in a contrary direction to the ordinary or    339
    customary route.                                          340
    (6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this    341
    Clause anything is done or not done, such shall not be deemed to be a    342
    deviation, but shall be considered as due fulfilment of the Contract of    343
    Carriage.                                                 344

18  General Ice Clause                                        345
    Port of loading                                           346
    (a) In the event of the loading port being inaccessible by reason of ice when the    347
    Vessel is ready to proceed from her last port or at any time during the voyage or    348
    on the Vessel's arrival or in case ice forms after the Vessel's arrival, the    349
    Master for fear of being frozen in is at liberty to leave without cargo, and this    350
    Charter Party shall be null and void.                     351
    (b) If during loading the Master, for fear of the Vessel being frozen in, deems it    352
    advisable to leave, he has liberty to do so with what cargo he has on board and    353
    to proceed to any other port or ports with option of completing cargo for the    354
    Owners' benefit for any port or ports including the port of discharge. Any part    355
    cargo thus loaded under this Charter Party to be forwarded to destination at the    356
    Vessel's expense but against payment of freight, provided that no extra    357
    expenses be thereby caused to the Charterers, freight being paid on quantity    358
    delivered (in proportion if lumpsum), all other conditions as per this Charter    359
    Party.                                                    360
    (c) In case of more than one loading port, and if one or more of the ports are    361
    closed by ice, the Master of the Vessel is to be at liberty either to load the part    362
    cargo at the open port and fill up elsewhere for their own account as under    363
    section (b) or to declare the Charter Party null and void unless the Charterers    364
    agree to load full cargo at the open port.                365

    Port of discharge                                         366
    (a) Should ice prevent the Vessel from reaching port of discharge the    367
    Charterers shall have the option of keeping the Vessel waiting until the re-    368
    opening of navigation and paying demurrage or of ordering the Vessel to a safe    369
    and immediately accessible port where she can safely discharge without risk of    370
    detention by ice. Such orders to be given within 48 hours after the Master or the    371
    Owners have given notice to the Charterers of the impossibility of reaching port    372
    of destination.                                           373
    (b) If during discharging the Master for fear of the Vessel being frozen in deems    374
    it advisable to leave he has liberty to do so with what cargo he has on board and    375
    to proceed to the nearest accessible port where she can safely discharge.    376
    (c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall    377
    apply and the Vessel shall receive the same freight as if she had discharged at    378
    the original port of destination, except that if the distance of the substituted port    379
    exceeds 100 nautical miles, the freight on the cargo delivered at the substituted    380
    port to be increased in proportion.                       381

19  Law and Arbitration                                       382
    (a) This Charter Party shall be governed by and construed in accordance with    383
    English law and any dispute arising out of this Charter Party shall be referred to    384
    arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or    385
    any statutory modification or re-enactment thereof for the time being in force.    386
    Unless the parties agree upon a sole arbitrator, one arbitrator shall be    387
    appointed by each party and the arbitrators so appointed shall appoint a third    388
    arbitrator, the decision of the three-man tribunal thus constituted or any two of    389
    them, shall be final. On the receipt by one party of the nomination in writing of    390
    the other party's arbitrator, that party shall appoint their arbitrator within    391
    fourteen days, failing which the decision of the single arbitrator appointed shall    392
    be final.                                                 393
    For disputes where the total amount claimed by either party does not exceed    394
    the amount stated in Box 25** the arbitration shall be conducted in accordance    395
    with the Small Claims Procedure of the London Maritime Arbitrators    396
    Association.                                              397
    (b) This Charter Party shall be governed by and construed in accordance with    398
    Title 9 of the United States Code and the Maritime Law of the United States and    399
    should any dispute arise out of this Charter Party, the matter in dispute shall be    400
    referred to three persons at New York, one to be appointed by each of the    401
    parties hereto, and the third by the two so chosen; their decision or that of any    402
    two of them shall be final, and for the purpose of enforcing any award, this    403
    agreement may be made a rule of the Court. The proceedings shall be    404
    conducted in accordance with the rules of the Society of Maritime Arbitrators,    405
    Inc.                                                      406
    For disputes where the total amount claimed by either party does not exceed    407
    the amount stated in Box 25** the arbitration shall be conducted in accordance    408
    with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,    409
    Inc.                                                      410
    (c) Any dispute arising out of this Charter Party shall be referred to arbitration at    411
    the place indicated in Box 25, subject to the procedures applicable there. The    412
    laws of the place indicated in Box 25 shall govern this Charter Party.    413
    (d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.    414
    (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.    415
    ** Where no figure is supplied in Box 25 in Part I, this provision only shall be void    416
    but the other provisions of this Clause shall have full force and remain in effect.    417

## Korea Logistics Systems Inc.

President  Nam Sun Cho

# Attachment No. 7

03-07-08;22:21 ;K.L.S                                ;025671451          # 2/ 23
24. Jun. 2008 18:01/3        ROBMARINE SHIPPING LTD      0144 No. 1042 P. 2/2

# W. ROBERTSON
### F.I.C.S., A.C.I.arb



The Atlas Room
37 Woodpecker Crescent
Burgess Hill
West Sussex
RH15 9XY
United Kingdom

Telephone: 01444 876940
Facsimile: 01444 876941
Mobile: 07732 350913
Residence: 01444 457136
E-mail: william@robmarine.com

---

## FACSIMILE MESSAGE

---

| | | | |
|---|---|---|---|
| Date: | Friday, June 20, 2008 | Time: | 11:36:58 |
| To: | Winter Scott, Solicitors, London | Attn: | Glenn Winter |
| Fax: | 020 7726 2371 | Ref: | GDW/ln/115/33 |
| From: | William Robertson | Ref: | WR/07/3350/mw |
| Re: | m.v. "BELUGA CONSTITUTION" ~ | | |
| | Charterparty Dated On or About 30.10.07 | | |
| Pages: | 1 | | |

I acknowledge safe receipt of your fax of yesterday and, in the circumstances, herewith accept appointment as Sole Arbitrator in the reference, following the default of the Respondents to appoint an Arbitrator of their choice.

I do need, however, to communicate my acceptance to the Charterers and would be grateful if you could let me have their full communication details by return. I look forward to hearing from you.

Best regards,

**W. Robertson**

03-07-09;22:21   ;K.L.S                                          ;025671451        #  1/ 23
25-JUN-2008  13:05        ROBMARINE SHIPPING LTD               01444 876941    P.01/01

# W. ROBERTSON
### F.I.C.S.; A.C.I.arb

The Atlas Room
37 Woodpecker Crescent
Burgess Hill
West Sussex
RH15 9XY
United Kingdom



Telephone: 01444 876940
Facsimile: 01444 876941
Mobile: 07732 350913
Residence: 01444 457136
E-mail: william@robmarine.com

---

## FACSIMILE MESSAGE

---

| | | | |
|---|---|---|---|
| Date: | Wednesday, June 25, 2008 | Time: | 13:18:37 |
| To:<br>Fax: | Winter Scott, Solicitors, London<br>020 7726 2371 | Attn:<br>Ref: | Glenn Winter<br>GDW/ln/115/33 |
| C.C.:<br>Fax: | Korea Logistic Systems Inc., Korea<br>00 82 25 67 1451 | Attn:<br>Ref: | Mr. J.S. Kim |
| From:<br>Re: | William Robertson<br>m.v. "BELUGA CONSTITUTION" ~<br>Charterparty Dated On or About 30.10.07 | Ref: | WR/07/3350/mw |
| Pages: | 1 | | |

I make reference to your fax messages of 24 June 2008, in which you acknowledged my confirmation of acceptance of appointment as Sole Arbitrator in this reference, following the failure of the Respondents, Korea Logistic Systems Inc., to appoint an Arbitrator of their choice.

By copy of this fax to the Respondents, I would advise them that it is now too late for them to appoint an Arbitrator of their choice but, albeit I am appointed by one party only, I shall act in a totally impartial manner and I invite the Respondents, Korea Logistic Systems Inc., to participate fully in the procedure of this arbitration.

I look forward to receiving appropriate claims submissions, with supporting documents, from Winter Scott to move this matter forward.

Best regards,

*Total 23 pages A (1/5)*

**W. Robertson**

# Attachment No. 8



8 SRIPACHA - NAKORN 3RD., SRIPACHA CHONBURI 20110
TEL : (66)(877-190315 4 FAX, (66)(631-0346 Web: sgscc.co.com E-Mail:operation-gp@sgscc.com

No.020/11/07.

## MATE'S RECEIPT

BANGKOK _____ TH NOV 2007

*Received on board the M.V.* **"BELUGA CONSTITUTION "**
*the undermentioned good in apparent good order and condition, unless otherwise stated, and subject to the terms and conditions of Owners Inner Bill of Lading:*

SHIPPER ___ *VATANA PHAISAL ENGINEERING CO., LTD.*

DESTINATION _____ *POINT LISAS PORT, TRINIDAD & TOBAGO*

| MARK & NUMBER | QUANTITY/DESCRIPTION OF GOODS  G/W (Kgs) | | CBM |
|---|---|---|---|
| | SAID TO BE | SAID TO WEIGH | SAID TO MEASURE |

**PETROTRIN NHT & CCR PROJECT**

EQUIPMENT AND MATERIALS FOR THE HEATER F-06-1901 FOR PETROTRIN PROJECT / TRINIDAD

| PORT OF DESTINATION | : POINT LISAS PORT, TRINIDAD & TOBAGO |
| PORT OF SHIPPING | : MAP TA PHUT PORT |
| SHIPPER | : VATANA PHAISAL ENGINEERING CO., LTD |
| | ON BEHALF OF SAMSUNG ENGINEERING |
| | CO., LTD |
| CONSIGNEE | : PETROTRIN THRU TRIKO |
| ITEM NO. | : F06-1901 |
| GROSS WEIGHT | KGS |
| NET WEIGHT | KGS |
| DIMENSION | x   x   CM |
| PACKAGES NO. | : SS-PTR-VPE-001 THRU SS-PTR-VPE-078 |

Components for use in the construction of Heater and/or parts there of

| Description | Quantity (KG) |
|---|---|
| **HEATER FABRICATION** | |
| Radiant Steel (Sidewall, Endwall, Floor, Arch) | 274,751 |
| Radiant Coils | 122,554 |
| Stack, Convection Duct & Take-off Duct | 198,028 |
| Convection Modules | 355,488 |
| Platform, Stairs, Ladders, Handrails, Gratings, Accessories | 166,097 |

Quantity : 1 Lot/1 Unit
( Details as per attached Master Packing list no. 5003-001 )

Packing details :

| | | |
|---|---|---|
| Total | : | 78 Packages |
| Total Net Weight | : | 1,034,993 Kgs. |
| Total Gross Weight | : | 1,116,919 Kgs. |
| Total Cubic Metres | : | 8,708.75 Cbm. |
| Country of Origin | : | Thailand |

CONSIGNEE
Petrotrin
Petrotrin Administration Building
Southern Main Road,
Pointe-A-Pierre, Trinidad
Petrotrin Thru Triko

B/L NO.

ON BOARD  /11/2007

Tallied on board by : ....................................................
Total number of packages. ....................................................
Loading completed : ....................................................
Location of Stowage : ....................................................
Both in words and figures : ....................................................

MASTER
M/V "BELUGA CONSTITUTION"

*The Master  Chief Officer:*

Remarks : 1. AS PER EXCEPTION CARGO LIST (2 PAGES)
from 18. NOV 2007
2. ATTACHED LIST (1 PAGE) UNITS LOADED IN 2/3 TIERS

# Attachment No. 9



삼성엔지니어링

June 20, 2008

Doc. No.: SECLI-PROC-08-632

Samsung Engineering Co., Ltd.
Samsung SEI Tower, 467-14 Dogok2-dong,
Gangnam-gu, Seoul
www.samsungineering.co.kr

TO: The CEO of KLS (Korea Logistics System Inc.)

Subject: Claim for damage related to the PETROTRIN Project
EX.MV. BELUGA CONSTITUTION
MAP TA PHUT, MASAN, MOJI/POINT LISAS

1. We wish your company continued prosperity.

2. Your company was in charge of general marine transportation for this company in relation to the subject project indicated above. Even though your company was obligated to provide safe and timely transport services, this company sustained massive damage including cargo damage for reasons clearly attributable to your company (e.g., unreasonable operation), repair and/or remanufacturing expenses incurred and resulting delay in delivery, and damaged reputation in relation to performing related projects.

3. We hereby notify you of the damage sustained by this company as described below. We would appreciate receiving your company's detailed payment plan and action plans within the earliest time possible.

A. Expenses incurred in the repair and remanufacture of the damaged cargo: KRW 845,000,000

B. Marine freight: USD 201,595.2 (1,259.97 CBM x USD 160/CBM)

C. Expenses incurred in domestic transportation and custom clearance: KRW 22,484,370

D. Estimated damage on the part of this company due to the delay in construction: USD 2,106,000

   - Initial schedule: 2008.1.9 (ATA of BELUGA Constitution)

   - Actually completed transport: 2008. 5.7 (ATA of BELUGA Family)

   - Duration of delay: 117 days

   - Delay penalty: USD 90,000/day x 20% (additional expenses incurred on-site to observe the construction schedule)

E. Expenses to be incurred in handling accidents M/H (Man Hour) (Logistics Division): KRW 9,360,000

   - Calculation of expenses: 2 persons x 2 hours/day x 117 days x KRW 20,000/hour (no. of persons in charge x hours required x labor cost)

As you are aware, we had to contend not only with the monetary losses described above but also the serious damage to the reputation of this company due to this transportation incident. Therefore, we request your company to take appropriate measures and compensate this company for the abovementioned damage as soon as possible. If no appropriate actions are taken, we shall deal with this case using all available means and methods. As we have already informed your company, please note that this incident has made it impossible for us to resume normal business with your company.

We look forward to your prompt action regarding this matter.

Jung Yeon Joo
CEO
Samsung Engineering Co., Ltd.


〔제41호서식〕

Registered No.  2008  –  3223

# NOTARIAL CERTIFICATE



## PYEONG-HWA LAW AND NOTARY OFFICE

163-3, 2-GA, EULJI-RO JUNG-GU SEOUL, KOREA

23230-04511일
90. 11. 26. 승인

T E L : 776-5371, 7680
F A X : 776-7682

 **PROLANGS**

Rm. 8th Fl., Namsung Plaza B/D (9th Ace Techno Tower), 345-30 Gasan-dong, Geumcheon-gu, Seoul, Korea
Phone : +82-2-783-9119 Fax : +82-2-784-2286, +82-2-786-8860

| | |
|---|---|
| **Date** | : **August 05, 2008** |
| **To** | : **KLS(Korea Logistics System Inc.)** |
| **Translation** | : **Claim for damage related to the PETROTRIN Project** |

# Translation Certificate

### Subject: Claim for damage related to the PETROTRIN Project
### Dated on August 05, 2008

Prolangs Inc., a Professional Language Solution Provider, hereby confirms that it has completed the translation and review work ordered by KLS(Korea Logistics System Inc.) on August 05, 2008.

**August 05, 2008.**

**Prolangs Inc.**

*Prolangs Inc.*
*C.E.O. & President*
*Tai Gun Kwon*

〔제45호서식〕

위 번역문은 원문과 상위없음을
서약합니다.  2008. 08. 0 5

I swear that the attached translation is
true to the original  2008. 08. 0 5

서약인 

_____
Signature

---

동부  2008  년 제 3223호

인    증

김—영창

위                        은
본직의 면전에서 위 번역문이
원문과 상위없음을 확인하고
서명날인하였다.
2008  8    5    이 사무소에서
위 인증한다.


공증인가 평화합동법률사무소
서울특별시 중구 을지로2가 163-3

공증담당
변 호 사  

Registerd No.  2008  -  3223

## NOTARIAL CERTIFICATE

Kim—Young Chang
                                personally
appeared before me, confirmed
that the attached translation
is true to the original
and subscribed his(her) name.
This is hereby attested
on this  5th    day of  Aug.
2008
            at this office

PYEONG-HWA LAW AND NOTARY PUBLIC OFFICE
163-3 , 2—Ga. Eulji—Ro, Jung—Gu
Seoul, Korea

Attorney-at-Law  Chang Won-Chan

This office has been authorized
by the Minister of Justice, the
Republic of Korea, to act as
Notary Public since
Sept .  8  , 1971 .
under Law No. 2254

---

공증인가 평화합동법률사무소



2008. 6. 20.
문서번호 : SECL-PROC-08-632

SAMSUNG ENGINEERING CO., LTD.
서울시 강남구 도곡2동 467-14
삼성 SEI타워 135-856
www.samsungengineering.co.kr

수 신: KLS(Korea Logistics System Inc.) 대표이사

제 목 : PETROTRIN PROJECT 화물손상에 관한 보상 요청
EX.MV. BELUGA CONSTITUTION
MAP TA PHUT, MASAN,MOJI/POINT LISAS

1. 귀사의 무궁한 발전을 기원합니다. 

2. 표제와 관련하여 당시 해상운송에 대한 총괄적인 운송업무를 담당하였던 귀사는 안전하고 적시적인 운송서비스를 제공하여야 함에도 불구하고 귀사의 명백한 귀책사유(무리한 운항 등등)로 인하여 당사 화물이 손상됨은 물론 수리, 재제작 및 이에 따른 납기 지연 등 많은 손해를 입었으며, 프로젝트 수행에 대한 명성이 훼손되는 등 막대한 지장이 초래되었습니다.

3. 따라서 당사에서는 다음과 같이 발생된 피해 금액을 통보하오니, 조속한 시일 내에 귀사의 구체적인 지불 방안 및 조치 계획을 통보해 주시기 바랍니다.

- 다 음 -

가. 손상화물 수리 및 재 제작과 관련된 비용 : KW 845,000,000

나. 해상운송비 : U$ 201,595.2  (1,259.97 CBM X U$160/CBM)

다. 국내 운송 통관 제비용 : KW 22,484,370

라. 공사기간 지연으로 인한 당사피해 예상금액 : U$ 2,106,000
- 최초 계획 일정 : 2008. 1. 9  (ATA of BELUGA CONSTITUTION)
- 실제 운송 완료 : 2008. 5. 7  (ATA of BELUGA FAMILY)
- 지연기간 : 117 Days
- 지연과징금 : U$90,000/Day X 20% (공기준수를 위한 현장 추가 비용)

마. 사고처리 M/H(Man Hour) 투입분(물류파트) : KW 9,360,000
- 비용 산정 : 2명 X 2Hour/Day X 117 Days X KW20,000/Hour (담당인원X소요시간X인건비)

주지하시는 바와 같이, 귀사의 운송사고로 말미암아 상기의 금전적 손해 외에도 당사의 명성에 심각한 손해를 입었기에 조속한 처리 방안 및 적절한 보상을 요청 드립니다. 만약 적절한 방안이 조치 되지 않을 경우, 당사에서 가용한 모든 방안을 강구하여 본건에 대하여 대응할 것이며, 아울러 旣 통보 드린 바와 같이 귀사와의 정상적인 업무재개가 불가함을 양지하시기 바랍니다. 끝.

대 표 이 사  정 연 주
삼 성 엔 지 니 어 링 (주)

삼 성 엔 지 니 어 링(주)